**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ELI LILLY AND COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>P2T2 HOLDINGS LLC d/b/a CENEXA LABS,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 4:26-cv-08806<br><br>JURY TRIAL DEMANDED |

**AMENDED COMPLAINT**

1. Defendant P2T2 Holdings LLC, doing business as Cenexa Labs ("Cenexa"), claims to be an online seller of purportedly "research use only" products. In reality, it is selling illegal drugs to consumers and profiting from it. Cenexa marketed and sold weight-management products it claims contain retatrutide, an investigational molecule developed by Plaintiff Eli Lilly and Company ("Lilly") for use as a prescription medicine.[1] Neither the U.S. Food and Drug Administration ("FDA") nor any other regulatory agency in the world has approved a medicine containing retatrutide for any use. And despite the pretext Cenexa uses, the substance that it sold is not a chemical intended for research use but instead a drug it intended and sold for human use—making Cenexa's product an illegal drug. Retatrutide cannot legally be sold for human use to anyone, anywhere, for any reason. Lilly brings this action to stop Cenexa's conduct—conduct that harms both consumers and Lilly.

---

[1] It appears that Cenexa has recently removed its retatrutide products from its website, although Cenexa's website does not say why the products were removed or whether the removal is only temporary. *See, e.g.*, Cenexa Labs, GLP3, https://cenexalabs.com/product/peptides/glp3-peptide/ (immediately redirecting to https://cenexalabs.com/peptides/).

2. The American prescription drug market is built on a fundamental premise: before any drug can be sold to patients, FDA must find it to be safe and effective through rigorous clinical testing and review of scientific evidence. Congress and the states developed this system of pre-market review over time after Americans were repeatedly and regularly harmed by unregulated, dangerous products sold as medicine. In fact, the Food, Drug & Cosmetic Act's requirement of rigorous clinical data supporting both safety and effectiveness *before* a drug is marketed to Americans traces directly to severe cases of patient death and harm from unapproved drugs sold by unscrupulous sellers.[2] The principle of evidence-based review for safety and effectiveness is essential to protecting Americans from unscrupulous sellers selling unsafe and untested drugs. Proving that safety and effectiveness for a new molecule like retatrutide requires lengthy clinical trials under strict ethics rules, billions of dollars in investments in research and manufacturing capacity, and—even then—fails to produce an approved medicine more than 90% of the time.

3. Even after the laws passed, unapproved drugs illegally sold as medicine have caused hundreds of deaths.[3] Cenexa has engaged in the same type of conduct. In selling its illegal drugs under a false pretext, Cenexa mocks the safety guarantees imposed by Congress and the states, flouts drug-regulatory standards, and exploits the clinical trial data from investigational medicines that Lilly and others have developed.

4. Lilly's Phase 3 clinical trials have produced powerful data, including a recent trial that showed retatrutide helped adults living with obesity lose an average of approximately 70

---

[2] *E.g.*, FDA, Promoting Safe & Effective Drugs for 100 Years, *FDA Consumer* (Jan.-Feb. 2006), https://www.fda.gov/media/110482/download?attachment (detailing the sulfanilamide and thalidomide scandals that led to the 1938 Act and 1962 Amendments, respectively).

[3] *E.g.*, FDA, Unapproved Drugs and Patient Harm (June 2, 2021), https://www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs-and-patient-harm.

pounds over 80 weeks at the highest dose.[4] But retatrutide is still an investigational molecule, and Lilly has not finished its clinical trials or submitted a final data package to FDA to establish the safety and effectiveness of any retatrutide medicine—nor has any other manufacturer—and FDA has not approved it. So, right now, there is no approved product containing retatrutide that has been proven safe and effective or authorized for human use. Accordingly, retatrutide is legally available only under strict protocols to select patients as an investigational new drug. No other lawful access to any retatrutide product for human use exists. The law is therefore clear and categorical: no drug containing retatrutide may be sold to consumers. Period.

5. The consequences of Cenexa's conduct are real and dangerous for consumers. Research use only products are, definitionally, not for human use. Consumers who purchase these illegal products are injecting themselves with substances of unknown composition, purity, potency, and sterility. These formulations and manufacturing quality processes have never been subject to FDA testing or review, clinical studies, or efficacy research. Illegal drugs made outside of a regulated, inspected supply chain are more likely to contain bacteria and other harmful contaminants and impurities. Consumers have no way to know whether these products are safe or effective.

6. Cenexa's illegal scheme also directly harms Lilly. In addition to its research developing retatrutide, Lilly has developed several FDA-approved obesity management medicines. By relying on Lilly's studies and presenting Cenexa's purported retatrutide products as superior to approved medicines treating obesity, Cenexa free rides on Lilly's innovation and research and development while bearing none of the costs, regulatory burdens, or responsibility

---

[4] Lilly | Investors, *Lilly's triple agonist, retatrutide, delivered powerful weight loss in pivotal Phase 3 obesity trial* (May 21, 2026), https://investor.lilly.com/news-releases/news-release-details/lillys-triple-agonist-retatrutide-delivered-powerful-weight-loss.

for patient safety during that process. By selling illegal retatrutide products to people seeking medication for their obesity-related conditions, Cenexa's illegal sales are costing Lilly sales of its FDA-approved obesity management medicines.

7. The harm to consumers and Lilly does not end there. Cenexa is also poisoning the well for the future of retatrutide medicines. Because no retatrutide medicine is yet commercially available from any lawful source, consumers' first experiences with products purporting to be retatrutide are occurring exclusively through black-market sellers like Cenexa. When those consumers suffer adverse events—as many already have—they associate them with retatrutide as a molecule, not the particular illegal product sold by the illegal seller. By the time Lilly brings its FDA-approved retatrutide medicine to market, Cenexa and sellers like it will have conditioned both potential patients who took its illegal drugs as well as the public at large to associate retatrutide with danger and harm, permanently damaging the approved medicine's potential to help patients who need it.

8. Cenexa's conduct is not an isolated incident. In just the last several months, FDA has issued at least 21 warning letters to sellers of illegal retatrutide products. Cenexa is part of a dangerous and growing black market that threatens public health—and violates the law of numerous states.

9. Lilly asks this Court to put a stop to it. Lilly seeks a permanent injunction barring Cenexa from marketing, selling, or distributing any product containing or purporting to contain retatrutide; damages and disgorgement of Cenexa's profits; and an award of attorneys' fees and costs. American consumers deserve better than the risky and unlawful products that Cenexa is selling them.

## THE PARTIES

10. Plaintiff Eli Lilly and Company is a corporation organized and existing under the laws of Indiana with its principal place of business in Indiana.

11. Defendant P2T2 Holdings LLC, doing business as Cenexa Labs, is a Texas-based limited liability company organized under the laws of the State of Wyoming on September 23, 2025, with Wyoming Secretary of State filing number 2025-001774498. Cenexa's mailing address and principal office is 680 S Cache Street, Suite 100-6949, Jackson, Wyoming, 83001, and its registered agent is Mountain Business Center, with an address of 960 Alpine Lane 4, PO Box 12200, Jackson, Wyoming, 83001. Upon information and belief, its sole member(s) is a citizen of Texas. Cenexa's website describes the company as "family-owned" and "Texas-built," adding that it is "based in the great state of Texas."[5] The "Contact Us" page of Cenexa's website lists its address as 680 S Cache Street, Suite 100-8790, Jackson, WY 83001, and its phone number as (713) 364-9228 (a Houston, Texas area code).[6] Cenexa operates an e-commerce website at cenexalabs.com through which it markets, distributes, and sells products it claims contain retatrutide and other peptides directly to consumers nationwide.

12. Cenexa ships its products, including its purported retatrutide products, from within the United States to all U.S. addresses.[7]

---

5 *See* Cenexa Labs, About, https://cenexalabs.com/about/ (last visited Oct. 29, 2026).

6 *See* Cenexa Labs, Contact, https://cenexalabs.com/contact/ (last visited Sept. 30, 2026).

7 *See* Cenexa Labs, Home, https://cenexalabs.com/ (last visited Sept. 30, 2026) (stating orders placed by 2pm CST ship same business day); Cenexa Labs, FAQs, https://cenexalabs.com/faqs/ (last visited Sept. 30, 2026) ("Most domestic orders are shipped USPS Priority Mail (1–3 business days for domestic orders) unless you choose an expidited [sic] option like FedEx 2-Day or Next day.").

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because this is a civil action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14. Cenexa is subject to personal jurisdiction in Texas because it has significant contacts with Texas, including operating from Texas and selling its products into Texas, and has purposefully availed itself of the privilege of conducting business in Texas. Although Cenexa is organized under Wyoming law, it self-identifies on its website as a "business based in the great state of Texas," operates a Houston, Texas phone number ((713) 364-9228), and owns and operates an e-commerce website at cenexalabs.com that marketed and sold purported retatrutide products to consumers nationwide, including to Texas customers. Cenexa has purposefully directed its commercial activities at Texas and derives substantial revenue from those activities.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Lilly's claims occurred in this District. Cenexa operates and conducts business in this District, including by engaging in its unlawful promotion and sale of retatrutide products here and by shipping its products here.

## GENERAL ALLEGATIONS

### I. FDA'S RIGOROUS AND THOROUGH REVIEW OF NEW DRUGS AND MEDICINES PROTECTS AMERICAN PATIENTS

16. In FDA's words, "American consumers benefit from having access to the safest and most advanced pharmaceutical system in the world."[8] The American system for reviewing

[8] FDA, *Drug Development and Approval Process | Drugs* (Aug. 8, 2022), https://www.fda.gov/drugs/development-approval-process-drugs.

new medicines, with its rigorous and thorough pre-market evaluation of scientific data, is crucial for public health.

17. Before a new drug can be brought to market, the drug must be clinically tested through a rigorous series of studies designed to determine whether the medication is safe and effective for use under specific conditions and for specific indicated purposes. As an initial step, a drug sponsor must obtain FDA authorization to administer an investigational drug to human subjects through an Investigational New Drug ("IND") application.[9] The IND process requires sponsors to submit detailed preclinical data, manufacturing information, and clinical protocols for FDA review. The IND does not authorize commercial sale of the drug. ***Any*** distribution to or use of the investigational drug on humans outside of an effective IND protocol is unlawful.

18. After proceeding through the years-long clinical trial process, sponsors must provide FDA with a New Drug Application ("NDA") or Biologics License Application ("BLA") containing sufficient evidence proving the product is safe and effective for its intended indications, among other things. That evidence is subjected to a structured, multi-disciplinary review involving physicians, statisticians, chemists, pharmacologists, and other scientists. Approval is granted only if this review establishes that a drug's health benefits outweigh its known risks in treating particular conditions.

19. Additionally, obtaining and maintaining FDA approval requires strict compliance with current Good Manufacturing Practices ("cGMP") regulations across the entire supply chain, from raw materials to finished medical products. Manufacturers must audit suppliers, control

---

[9] *See* 21 U.S.C. § 355(i); 21 C.F.R. § 312.

material specifications, and validate processes to ensure the safety, identity, and strength of the product.[10]

20. FDA approval is notoriously hard to achieve in the United States. More than 90% of candidates fail. It is also an enormously costly and time-intensive process. On average, it takes ten to fifteen years and costs $2.6 billion to develop one new FDA-approved medicine.

21. If a prescription drug or biologic is approved, FDA's vigorous oversight continues after its approval. Among other things, sponsors must report all promotional materials to FDA; track and trace each finished product and report any deviations; and promptly report adverse events.

22. This continuous oversight allows America to represent what FDA has called "the gold standard" for pharmaceutical regulation.

23. In addition to federal regulations, states play an important role in regulating the sale of drugs and biologics within their borders. Most states prohibit the sale of prescription drugs that lack FDA or state regulatory approval and further prohibit the sale of even approved drugs that are misbranded (e.g., false, misleading, or inaccurate information on drug labels) or adulterated (e.g., manufactured under unsanitary conditions).

## II. LILLY DEVELOPS FDA-APPROVED OBESITY MANAGEMENT MEDICINES AND INVESTIGATIONAL TREATMENTS

24. Lilly is an international medicine company and pharmaceutical manufacturer. Throughout its 150-year existence, Lilly has pioneered countless life-changing discoveries. Today, Lilly's medicines help more than 70 million patients across the globe.

---

[10] FDA, *Facts About the Current Good Manufacturing Practice (CGMP)* (Nov. 21, 2025), https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practice-cgmp.

25. Lilly developed tirzepatide over nearly a decade of research and development, conducting 37 clinical trials involving tens of thousands of patients. Tirzepatide is a first-in-class dual-action molecule that simultaneously targets receptors for glucagon-like peptide-1 ("GLP-1") and glucose-dependent insulinotropic polypeptide ("GIP").

26. Tirzepatide is the active pharmaceutical ingredient in MOUNJARO® and ZEPBOUND®, two of Lilly's important FDA-approved medicines. MOUNJARO® was approved by FDA to treat type 2 diabetes. ZEPBOUND® was approved by FDA for chronic weight management in adults with obesity or overweight with at least one weight-related medical condition, as well as moderate-to-severe obstructive sleep apnea ("OSA") in certain adults with obesity.

27. Lilly also brought to market the novel molecule orforglipron, which targets GLP-1 receptors. Orforglipron is the active pharmaceutical ingredient in FOUNDAYO™, which was approved by FDA on April 1, 2026, to treat obesity or overweight with at least one weight-related comorbid condition. It is a once-daily oral pill that represents a significant advance in obesity treatment as one of the first oral GLP-1 receptor agonists approved for chronic weight management.

28. Lilly is the only lawful source of commercially manufactured tirzepatide products in the United States. No other company has obtained FDA approval to manufacture or sell tirzepatide. Likewise, Lilly is the only company that has sought and received FDA approval for orforglipron. No other entity has conducted the clinical trials or obtained the regulatory approvals necessary to lawfully market orforglipron in the United States.

29. Over the past decade, Lilly has developed another investigational molecule, retatrutide, a triple hormone receptor agonist that simultaneously activates receptors for GIP, GLP-

1, and glucagon—hence the designation "triple agonist." Lilly is studying retatrutide in several Phase 3 clinical trials to evaluate its potential efficacy and safety in treating obesity and overweight with at least one weight-related medical problem, type 2 diabetes, knee osteoarthritis pain, moderate-to-severe OSA, chronic low back pain, cardiovascular and renal outcomes, and metabolic dysfunction-associated steatotic liver disease. In Lilly's clinical trials, retatrutide is administered as a once-weekly subcutaneous injection.

30. Lilly identified retatrutide as a candidate through extensive laboratory and analytical work, advanced it through preclinical testing, and filed an Investigational New Drug application with FDA to authorize human clinical trials. Lilly began the clinical trial process for retatrutide in 2019.

31. Lilly holds an effective IND application for retatrutide, meaning that Lilly is authorized under federal law to conduct human clinical trials to evaluate the molecule's safety and efficacy.[11] An IND authorizes only carefully controlled clinical investigations and use under strict FDA oversight; it does not permit general commercial distribution or sale of the investigational drug to consumers.

32. While Lilly's controlled tests are encouraging, no retatrutide medicine has yet been approved by FDA or any other regulatory agency in the world—and especially not Cenexa's products. No medicine containing retatrutide has approved labeling, retatrutide as an API is not a component of any FDA-approved product, and no manufacturing process for retatrutide API or finished products has been validated under cGMP for public commercial distribution. Any sale of retatrutide for human use is illegal.

[11] 21 U.S.C. § 355(i); 21 C.F.R. § 312.

## III. BAD ACTORS ILLEGALLY SELL RETATRUTIDE TO CONSUMERS PRIOR TO ITS FDA APPROVAL

### A. The Black Market for Retatrutide

33. The powerful clinical trial results for retatrutide have generated significant consumer interest in it. Bad actors have taken advantage of that interest to make a profit, and a black market has emerged that is threatening consumer safety by illegally advertising, selling, and distributing products purportedly containing retatrutide directly to the public.

34. Capitalizing on consumer demand for obesity management medications, sellers—including online retailers, "research use only" peptide suppliers like Cenexa, and med spas—bypass the lawful approval process. They offer consumers what they call "retatrutide," but the substance they sell is an illegal drug produced entirely outside of FDA's oversight—often sourced from unknown foreign suppliers and illegally imported.

35. These illegal sales of purported retatrutide products represent a dangerous end-run around the rigorous FDA approval process. By selling unverified substances directly to consumers for human use, Cenexa and other sellers like it expose the public to unknown adverse events while undermining the regulatory framework designed to protect patients and promote the lawful development of safe and effective new drugs.

### B. FDA's and Lilly's Efforts to Warn Consumers

36. FDA has recognized the danger of illicit retatrutide and taken direct action against retatrutide sellers to curtail these illegal sales. FDA has explicitly stated in warning letters[12] that "introducing or delivering these products for introduction into interstate commerce violates"

[12] FDA typically uses warning letters to notify parties of what FDA identifies as significant violation(s) of federal requirements. *See* FDA, About Warning and Close-Out Letters (Mar. 20, 2024), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/about-warning-and-close-out-letters.

federal law.[13] FDA has also cautioned consumers "not to purchase" retatrutide products labeled "for research purposes" because "they are of unknown quality and may be harmful to their health."[14] Most recently, FDA reiterated that retatrutide is an "unapproved drug," is "not [a] component[] of FDA-approved drugs," and has "not been found safe and effective for any condition."[15]

37. In total, FDA has sent at least 21 warning letters related to retatrutide, in addition to more than 100 warning letters since September 2025 to entities marketing compounded GLP-1 receptor agonists with "false or misleading claims."[16] As FDA stated in a recent press release, these warning letters mark "a new era" of enforcement against the illegal sale of unapproved drugs.[17]

38. Lilly has also publicly warned consumers about the dangers of illegal products claiming to be or to contain retatrutide, making clear that selling retatrutide to consumers for human use is illegal, and that consumers have no way to verify the safety of what they are receiving

---

[13] *E.g.*, Warning Letter from FDA to Gram Peptides, MARCS-CMS-721806 (Mar. 31, 2026), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/gram-peptides-721806-03312026.

[14] FDA, FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss (June 15, 2026), https://www.fda.gov/drugs/drug-alerts-and-statements/fdas-concerns-unapproved-glp-1-drugs-used-weight-loss.

[15] *Id.*

[16] For example, on March 31, 2026, FDA issued warning letters to: (a) Gram Peptides for selling "Retatrutide" (also marketed as "GLP-1-R peptide") that it promoted for "appetite suppression, insulin sensitivity, thermogenesis, and fat-oxidation"; (b) Prime Sciences for selling "GLP1-R" (identified as retatrutide) that it promoted with claims that "[r]etatrutide has shown higher weight loss results in clinical trials, with an average of up to 28% body weight reduction"; and (c) Lovega LLC d/b/a Pink Pony Peptides for selling "GLP-3 RT" (identified as retatrutide) that it promoted as offering "three times the fat-fighting horsepower" with "jaw-dropping results."

[17] *See* FDA, FDA Warns 30 Telehealth Companies Against Illegal Marketing of Compounded GLP-1s (Mar. 3, 2026), https://www.fda.gov/news-events/press-announcements/fda-warns-30-telehealth-companies-against-illegal-marketing-compounded-glp-1s; *see also, e.g.*, Warning Letter from FDA to PekCura Labs, MARCS-CMS-721709 (Mar. 31, 2026), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/pekcura-labs-721709-03312026.

on the black market.[18] To combat black-market drugs, Lilly continues to work with law enforcement and regulatory authorities.

**C. Consumers Are Reporting Adverse Events After Taking Black-Market Retatrutide**

39. Online communities, including Reddit forums like r/Retatrutide and r/Biohacking, demonstrate the thriving black market for illegal retatrutide products and its dangers. Consumers openly discuss purchasing, self-administering, and dosing of retatrutide products obtained from unregulated sources, including products sourced from Chinese manufacturers and suppliers.[19]

40. These online communities report adverse events, including emergency room visits with increased heart rates; elevated fasting glucose levels; severe skin reactions described as a sensation of "tiny mites or something crawling and biting"; brain fog; and concerns about bacterial contamination and endotoxins from products not manufactured in regulated or sterile laboratories.[20] Upon information and belief, consumers experienced these adverse events without receiving any warnings.

---

[18] *See, e.g.*, Lilly, *What to know about retatrutide: An investigational triple hormone receptor agonist,* https://www.lilly.com/news/stories/what-to-know-about-retatrutide (last updated Sept. 2026).

[19] *See, e.g.*, u/Confident-Rhubarb957, REDDIT (r/Biohacking), "Tirz - Reta switch. And Reta dosing advice," https://www.reddit.com/r/Biohacking/comments/1rsx0oa/tirz_reta_switch_and_reta_dosing_advice/ (last visited Oct. 1, 2026); u/improximus, REDDIT (r/BodyHackGuide), "Why Reta? Why not Tirz?" https://www.reddit.com/r/BodyHackGuide/comments/1szktx8/why_reta_why_not_tirz/ (last visited Oct. 1, 2026).

[20] u/D3st9ny, REDDIT (r/Retatrutide), "Bacteria and endotoxins," https://www.reddit.com/r/Retatrutide/comments/1suodk7/bacteria_and_endotoxins/ (last visited Oct. 1, 2026); u/cac520, REDDIT (r/Retatrutide), "Realized it's time to stop Reta," https://www.reddit.com/r/Retatrutide/comments/1pspn4r/realized_its_time_to_stop_reta/ (last visited Oct. 1, 2026); u/BTheFurnace, REDDIT (r/Retatrutide), "Those who have taken reta for over 6 months: Has your resting heart rate returned to normal?" https://www.reddit.com/r/Retatrutide/comments/1rcxz1m/those_who_have_taken_reta_for_over_6_months_has/?rdt=49360 (last visited Oct. 1, 2026) (comment posted by Last-boomer1964).



r/Retatrutide • 5mo ago
cac520

**Realized it's time to stop Reta 😞**

I'm down almost 40lbs and have a lot more to lose. I think Reta can get me to my goal but these side effects are wearing me down. First, my fasting glucose levels are high. I'm eating very little sugar and wasn't having this issue previously. Nothing I do brings it down. Second, the skin reaction-it feels like tiny mites or something crawling and biting/stinging me. Took a minute to figure out what the issue was. This kicked in when I hit 4mg. My skin is raw from the scratching. Benadryl helps, but not 100%. Hubs is on Tirz so he'll transition to Reta and I'll go to Trizzy. Wish us luck.

Besides the usual nausea and constipation, are you guys experiencing side effects?

41. One consumer reported being hospitalized after using a purported retatrutide product obtained from unregulated sources, while another user described a friend who "got hospitalized because of the bacteria" in products that "aren't made in regulated or sterile labs."[21] Indeed, there are ***no*** regulated manufacturers authorized to prepare retatrutide for human commercial use. A recent analysis shows that individuals who used black-market retatrutide lost an average of 4.7% to 7.2% of their body weight over three to twelve months—while participants in Lilly's clinical trial lost more than twice the amount of weight over the same time periods—confirming the inferior quality of illegal retatrutide products that are being unlawfully sold to and used by consumers.[22] Further, an independent testing lab recently reported widespread purity concerns with black-market retatrutide, including contamination with heavy metals like lead, cadmium, and mercury.[23]

---

[21] u/D3st9ny, REDDIT (r/Retatrutide), "Bacteria and endotoxins," https://www.reddit.com/r/Retatrutide/comments/1suodk7/bacteria_and_endotoxins/ (last visited Oct. 1, 2026); u/cac520, REDDIT (r/Retatrutide), "Realized it's time to stop Reta," https://www.reddit.com/r/Retatrutide/comments/1pspn4r/realized_its_time_to_stop_reta/ (last visited Sept. 30, 2026).

[22] Elizabeth Cairns, *Using Gray-Market Versions of Lilly's Triple-G Leads to Relatively Poor Weight Loss, Study Finds*, Endpoints News (Aug. 20, 2026), https://endpoints.news/using-gray-market-versions-of-lillys-triple-g-leads-to-relatively-poor-weight-loss-study-finds/.

[23] Rachel Carbonell, Caitlyn Gribbin & Andi Yu, *New Testing of Black-Market Peptides Reveals Dangerous Dosing Levels*, RNZ (Aug. 28, 2026), https://www.rnz.co.nz/news/world/1158694/new-testing-of-black-market-peptides-reveals-dangerous-dosing-levels.

## IV. CENEXA SELLS (OR SOLD) ILLEGAL RETATRUTIDE PRODUCTS IN VIOLATION OF STATE LAW

42. Cenexa marketed, distributed, and sold products it claimed contain retatrutide. Cenexa operates an e-commerce website at cenexalabs.com through which it sells (or sold) retatrutide products—marketed under the name "GLP3"—directly to consumers nationwide.




43. In a transparent effort to mask the illegal nature of its business, Cenexa's website in places indicates that it is selling "research use only" products.[24] It also states that "[a]ll products on this site are for Research, Development use only. Products are Not for Human consumption of any kind."[25] But "research use only" is a designation for products that are to be used in clinical *laboratory* settings for research, not on human patients in any manner. And Cenexa's website

[24] *See, e.g.*, Cenexa Labs, GLP3, https://cenexalabs.com/product/peptides/glp3-peptide/ (last visited Sept. 30, 2026). As noted above, *see supra* note 1, it appears that Cenexa has recently removed references to retatrutide or "GLP3" from its website.

[25] *Id.*

makes clear that it is selling materials for human use, making its products illegal, unapproved drugs. Most flagrantly, Cenexa *specifically asks* customers to avoid mentioning they are using its products for human use in their reviews.[26]




44. Cenexa's retatrutide product page—listed under the name "GLP3" and identified also as "LY3437943, GLP-3, and GLP3-R"[27]—described retatrutide as "a triple-receptor agonist" studied for obesity and metabolic disease "allowing simultaneous activation of all three receptors."[28] The page further stated that this "triple-agonist approach enables researchers to study the combined effects of appetite regulation, insulin secretion, and energy expenditure in a single molecule." In other words, Cenexa claimed that its product targets the same metabolic pathways as Lilly's FDA-approved obesity management medications and is superior to dual-agonist products. It also highlighted how Cenexa's "GLP3 influences metabolism," including because it

[26] Cenexa Labs, Cenexa VIP Program Reviews, https://cenexalabs.com/cenexa-vip-program-reviews/ (last visited Sept. 30, 2026).

[27] Cenexa Labs, GLP3, https://cenexalabs.com/product/peptides/glp3-peptide/ (last visited Sept. 30, 2026).

[28] *See, e.g.*, *id.* (June 1, 2026 Certificate of Analysis identifying the "Compound" as "Retatrutide (GLP3)").

"delays gastric emptying," "promotes satiety signaling in appetite-regulating brain regions," "facilitates lipid clearance from circulation, and modulates fat deposition." Cenexa's numerous descriptions of the benefits its "GLP3" can have on the human body reflect its effort to target consumers interested in obesity management.

45. In apparent recognition of its illegal conduct, Cenexa has recently been deleting from its website certain webpages that referred specifically to "retatrutide" (instead of GLP3 or the other code names Cenexa has ascribed its product) though the certificates of analysis on its website expressly identified "retatrutide."[29] Most recently, it has removed most references to "GLP3" from its website, as well.[30]

46. Additionally, until recently, Cenexa extensively cited Lilly's proprietary clinical trial data, including that GLP3 produced a "[m]ean weight loss of 24.2% (approximately 58 pounds or 26.2 kg) with 12 mg weekly dose after 48 weeks" and that "93% of participants on 12 mg achieved 15% or more weight loss." Several pages referenced Lilly's Phase 2 NEJM publication, the MASLD sub study, and Type 2 diabetes trial results—all data generated through Lilly's significant investment in clinical research—as reflected below.

---

[29] *Id.*

[30] *See, e.g.*, Cenexa Labs, Shop, https://cenexalabs.com/Shop/ (no longer listing retatrutide or "GLP3") (last visited Oct. 29, 2026); *but see* Cenexa Labs, Peptide Research, https://cenexalabs.com/peptide-research/ (listing "GLP3" as a "popular research categor[y]") (last visited Oct. 29, 2026).




47. Most egregiously, Cenexa's product page featured a "Lead Researcher Spotlight" on Dr. Tamer Coskun, Lilly's Associate Vice President of Diabetes Research, who it says led the discovery and development of retatrutide.[31] While Cenexa included a disclaimer that it has "no affiliation" with Dr. Coskun or Lilly, the prominent inclusion of a Lilly lead scientist on a product sales page is designed to lend the appearance of scientific legitimacy to Cenexa's illegal products.[32]

48. Cenexa's website features numerous consumer-oriented sales features that are inconsistent with legitimate research-chemical supply and confirm that Cenexa is selling its products for human use.[33] These include: (a) a "Subscribe & Save" auto-recurring subscription model offering 10% discounts on repeat deliveries; (b) a "Buy One Get One" promotional deal on

---

[31] Cenexa Labs, GLP3, https://cenexalabs.com/product/peptides/glp3-peptide/ (last visited Sept. 30, 2026).

[32] *Id.*

[33] Cenexa also sells products in consumer-ready formats that no legitimate research laboratory would require, including peptide capsules, nasal sprays, and topical peptides. These ready-to-use consumer formats further confirm that Cenexa's products are intended for personal human use, not laboratory research. *See* Cenexa Labs, Peptides, https://cenexalabs.com/peptides (last visited Sept. 30, 2026).

GLP3 vials with a limit of 3 per customer; (c) a loyalty rewards program called "Cenexa Bucks" that awards points on every purchase; and (d) a claim of "18,000+ Happy Customers."[34]




49. Cenexa's Frequently Asked Questions page instructs purchasers that "[o]nce reconstituted (liquid added) [peptides] should be stored in refridgerator or freezer," and "[d]oing so they will last for 30 to 45 days"—language oriented to individual end-users self-administering the product, not to institutional research laboratories with established protocols and cold-chain storage.[35]

50. Cenexa also sells (or sold) a "GLP3 + Cagrilintide Blend" that apparently combines retatrutide with cagrilintide—another unapproved investigational compound—and marketed it as "The Four-Pathway Metabolic Research Compound" for "comprehensive metabolic regulation."[36]

---

[34] *See* Cenexa Labs, GLP3, https://cenexalabs.com/product/peptides/glp3-peptide/ (last visited Sept. 30, 2026); Cenexa Labs, BOGO GLP3 Special Offer, https://cenexalabs.com/product/bundles/bogo-glp3-special-offer/ (last visited Sept. 30, 2026).

[35] Cenexa Labs, Do You Have Questions? https://cenexalabs.com/faqs/ (last visited Sept. 30, 2026).

[36] Cenexa Labs, GLP3 + Cagrilintide, https://cenexalabs.com/product/peptides/glp3-cagrilintide-blend-peptide (last visited Sept. 30, 2026).

This blend product further demonstrates that Cenexa was marketing unapproved weight-loss and metabolic "research compound[s]" directly to human consumers.

> **THE FOUR-PATHWAY METABOLIC RESEARCH COMPOUND**
>
> **Also known as:** GLP3/Cagri Blend, Lean Blend, CagriGLP3
>
> **WHY RESEARCHERS CHOOSE GLP3 + CAGRILINTIDE BLEND PEPTIDE**
>
> Unlike single or dual-pathway peptides, this blend targets four distinct metabolic receptors—combining GLP3's triple incretin action (GLP-1, GIP, and glucagon receptors) with Cagrilintide's amylin pathway activation. This makes it uniquely valuable for researchers studying comprehensive metabolic regulation, allowing investigation of both incretin-dependent and incretin-independent appetite control mechanisms in a single model. When researchers need to understand how multiple hormonal pathways interact synergistically, this blend provides the most complete picture currently available.

51. Cenexa's illegal retatrutide products are unapproved new drugs. Under federal law, a product (other than food) is a "drug" if, as relevant here, it is intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease, is intended to affect the structure or any function of the human body, or is intended for use as a component of such products.[37] The laws of Alaska, Colorado, Connecticut, North Carolina, South Carolina, Tennessee, Texas, and Washington all define a "drug" using the same test.[38] By selling products that purportedly treat obesity (a recognized disease) and promote weight loss (by affecting the structure and function of the body as a receptor agonist), Cenexa and sellers like it are selling "drugs" that have not been approved—and are undeniably illegal.

52. No medicine containing retatrutide has ever received FDA approval. It is an investigational molecule that is not approved for human use.

53. Cenexa does not hold and cannot hold a valid marketing application for retatrutide because no such application has been filed with or approved by FDA.

---

[37] 21 U.S.C. § 321(g).

[38] Alaska Stat. § 17.20.370(7); Colo. Rev. Stat. § 12-280-103(16); Conn. Gen. Stat. § 21a-92(8); N.C. Gen. Stat. § 106-121(6); S.C. Code § 39-23-20; Tenn. Code § 53-1-102(14); Tex. Health & Safety Code § 431.002(14); R.C.W. § 69.04.009.

54. Cenexa's products do not qualify for any compounding exemption under Section 503A of the FDCA, 21 U.S.C. § 353a, because, among other reasons, retatrutide is not a component of any FDA-approved drug and therefore cannot be lawfully compounded. FDA has stated unequivocally: "Retatrutide . . . cannot be used in compounding under federal law," is "not [a] component[] of FDA-approved drugs," and has "not been found safe and effective for any condition."[39]

55. Upon information and belief, Cenexa has sold and may continue to sell unapproved retatrutide products to consumers in Alaska, Colorado, Connecticut, North Carolina, South Carolina, Tennessee, Texas, and Washington. Cenexa's sale of unapproved retatrutide products violates the laws of those states, each of which prohibits the sale of unapproved new drugs.

56. Cenexa's products pose a serious risk to consumer health and safety. Unlike FDA-approved drugs, Cenexa's products have not been verified for safety, efficacy, or quality through clinical trials and are not manufactured through a regulated, inspected supply chain. Consumers who purchase these products are exposed to substances of unknown composition, purity, potency, and sterility.

57. Cenexa has profited from its unlawful conduct at the expense of consumers and Lilly.

## V. CENEXA'S UNLAWFUL ADVERTISING AND SALES OF RETATRUTIDE HARM CONSUMERS AND LILLY

58. Consumers who purchase Cenexa's illegal retatrutide products are harmed because they receive illegal and unverified products of unknown safety, purity, potency, and efficacy.

[39] FDA, FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss (June 15, 2026), https://www.fda.gov/drugs/drug-alerts-and-statements/fdas-concerns-unapproved-glp-1-drugs-used-weight-loss.

Indeed, consumers report experiencing adverse events after self-administering black-market retatrutide products, *see supra* Section III.C.

59. Cenexa's conduct also causes unfair competitive harm to Lilly. Some consumers who meet the criteria for obesity management medications are choosing illegal retatrutide products over Lilly's FDA-approved obesity-management medicines, citing illegal sellers' claims of lower cost and perceived superior efficacy as the primary drivers. For example, one user reported that the cost of "10×20mg of retatrutide was about half the cost of a single 7.5mg Mounjaro pen," making it "hard to justify staying on Mounjaro long term."[40] Another user who lost 169 pounds on tirzepatide asked whether "switching over to reta" would help reach her remaining weight-loss goal.[41] These consumer accounts demonstrate that consumers are being diverted from Lilly's FDA-approved medicines to risky, illegal products.

60. By selling illegal retatrutide products, Cenexa diverts consumers away from Lilly's FDA-approved products, including MOUNJARO®, ZEPBOUND®, and FOUNDAYO™. Both companies market and sell products to the same potential customers seeking treatment for obesity, type 2 diabetes, and/or related metabolic conditions. Because Cenexa's unapproved retatrutide products and Lilly's FDA-approved medicines target the same consumer pool, Cenexa's illegal sales are in direct competition with Lilly and are costing Lilly sales of its FDA-approved obesity-management medicines. Cenexa's advertising of its purported retatrutide products as superior to existing obesity-management products stands to exacerbate this diversion. Cenexa's claim of "18,000+ Happy Customers" and its Subscribe & Save subscription model indicate significant

---

[40] u/ApplicationNo7327, REDDIT (r/Retatrutide), "Switching from Mounjaro (Tirzepatide) to Reta - my experience," https://www.reddit.com/r/Retatrutide/comments/1stnp7l/switching_from_mounjaro_tirzepatide_to_reta_my/ (last visited Oct. 1, 2026).

[41] u/soggy_bananah, REDDIT (r/Retatrutide), "Switch from tirz?" https://www.reddit.com/r/Retatrutide/comments/1ssuf15/switch_from_tirz/ (last visited Oct. 1, 2026).

ongoing consumer sales volume, with consumers making repeat purchases of Cenexa's illegal products for personal use.

61. Cenexa also undermines the market for Lilly's future retatrutide medicine, if approved, which Lilly is studying through the lawful FDA approval process. Cenexa is selling (or has sold) unsafe, illegal products that are poisoning the well of consumer confidence in retatrutide as a potential therapeutic option if it is one day approved. Because there is no currently approved retatrutide medicine that is commercially available from any lawful source, consumers' first experiences with retatrutide are occurring exclusively through black-market sellers like Cenexa. When these people experience adverse events—as many already report, *see supra* Section III.C—they often do not attribute those harms to Cenexa but instead to all products containing *retatrutide*.[42] Those consumers are unlikely ever to try retatrutide again—including any lawful version that Lilly ultimately brings to market after FDA approval. Even more, the experiences of those consumers are likely to deter other potential users. Each adverse event caused by Cenexa's illegal products thus represents not only a current injury to the consumer, but a permanent loss of future Lilly patients.

62. The reputational contamination caused by Cenexa's unsafe products extends beyond the individual consumers who are directly harmed. Consumers who experience adverse events from black-market retatrutide share those experiences publicly—on Reddit, on social media, and in personal networks—creating negative associations between retatrutide and adverse events. These public accounts will deter other potential consumers from ever using retatrutide products if approved by FDA. By the time Lilly brings its FDA-approved retatrutide product to

---

[42] *See, e.g.*, u/cac520, REDDIT (r/Retatrutide), "Realized it's time to stop Reta," https://www.reddit.com/r/Retatrutide/comments/1pspn4r/realized_its_time_to_stop_reta/ (last visited Oct. 1, 2026) (explaining decision to "stop Reta" based on reactions to and side effects from "Reta").

market, Cenexa and sellers like it will have already conditioned the public to associate retatrutide as an ingredient with danger, illegality, and reduced or total lack of efficacy. Lilly will thus be forced to overcome not only the ordinary challenges of a new product launch, but the additional burden of rehabilitating a product that has been tarnished by Cenexa's unlawful conduct.

63. Cenexa's conduct also causes irreparable harm to Lilly's reputation and goodwill. Cenexa trades on the reputation and clinical data associated with Lilly's products and retatrutide. On information and belief, if consumers experience adverse effects from Cenexa's illegal products, they are likely to attribute those harms to retatrutide or to Lilly, damaging Lilly's brand and the public's confidence in Lilly's products and pipeline.

64. Finally, Cenexa's conduct harms innovation and the competitive marketplace by allowing Cenexa to sell products as if they were pharmaceutical-grade medicines for human use with FDA approval, when they are not. Cenexa avoids the rigorous testing, regulatory compliance, and quality controls that Lilly and other pharmaceutical companies must satisfy, and instead free rides on Lilly's investment in developing legitimate, safe medicines by selling illegal retatrutide through intentionally deceptive schemes.

65. The harms caused by Cenexa's conduct are ongoing and will continue unless Cenexa is permanently enjoined from marketing and selling its illegal products purportedly containing retatrutide. Cenexa has profited from its unlawful conduct at the expense of consumers and Lilly.

66. Lilly has no adequate remedy at law. The damage to Lilly's reputation, goodwill, and competitive position cannot be fully compensated through monetary damages alone.

## CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**Unfair Competition**
**in Violation of the Alaska Unfair Trade Practices and Consumer Protection Act**
**Alaska Stat. §§ 45.50.471 *et seq*.**

67. Lilly incorporates by reference the allegations above as if fully set forth herein.

68. The Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. §§ 45.50.471 *et seq.*, prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

69. Alaska Stat. § 17.20.110(a)(1)–(2) prohibits the sale, delivery, or offering for sale of any "new drug" unless an application has been approved for such drug under federal law. Under Alaska law, a "new drug" means a drug that is not generally recognized among qualified experts as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof, or which has not, other than in such investigations, been used to a material extent or for a material time under such conditions.

70. Cenexa's purported retatrutide products are "new drugs" within the meaning of Alaska law. Retatrutide has not been approved by FDA, is not yet generally recognized as safe and effective, and has not been used to a material extent or for a material time.

71. Cenexa has violated Alaska Stat. § 17.20.110(a)(1)–(2) by distributing, selling, and offering for sale unapproved retatrutide products to consumers in Alaska and throughout the United States.

72. Cenexa's sale of unapproved new drugs in violation of Alaska Stat. § 17.20.110(a)(1)–(2) constitutes an unfair or deceptive act or practice and an unfair method of competition in violation of the Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. §§ 45.50.471 *et seq.*

73. Lilly has been injured by Cenexa's unlawful conduct, including through lost sales, damage to goodwill, harm to Lilly's competitive position, and diversion of consumers to unapproved and potentially unsafe products.

74. Lilly has standing to bring this action and is entitled to all available remedies under Alaska Stat. § 45.50.531, including injunctive relief, damages, and reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
## Unfair Trade Practices in Violation of the Colorado Consumer Protection Act Colo. Rev. Stat. § 6-1-105(z)

75. Lilly incorporates by reference the allegations above as if fully set forth herein.

76. The Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105, prohibits deceptive trade practices, including under subsection (z), any other act or practice which is unfair or deceptive to the consumer.

77. Colo. Rev. Stat. § 12-280-131(1) prohibits the sale or offering for sale of any "new drug" unless an approved application is in effect for such drug under federal law.

78. Cenexa's purported retatrutide products are "new drugs" within the meaning of Colorado law. Retatrutide has not been approved by FDA, is not yet generally recognized as safe and effective, and has not been used to a material extent or for a material time.

79. Cenexa has violated Colo. Rev. Stat. § 12-280-131(1) by distributing, selling, and offering for sale unapproved retatrutide products to consumers in Colorado and throughout the United States.

80. Cenexa's sale of unapproved new drugs in violation of Colo. Rev. Stat. § 12-280-131(1) constitutes a deceptive trade practice in violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(z).

81. Lilly has been injured by Cenexa's unlawful conduct, including through lost sales, damage to goodwill, harm to Lilly's competitive position, and diversion of consumers to unapproved and potentially unsafe products.

82. Lilly has standing to bring this action and is entitled to all available remedies under Colo. Rev. Stat. § 6-1-113, including injunctive relief, damages, and reasonable attorneys' fees and costs.

## THIRD CAUSE OF ACTION
## Unfair Trade Practices
## in Violation of the Connecticut Unfair Trade Practices Act
## Conn. Gen. Stat. § 42-110b(a)

83. Lilly incorporates by reference the allegations above as if fully set forth herein.

84. The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b(a), provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

85. Conn. Gen. Stat. § 21a-110(a)–(b) prohibit the sale, delivery, or offering for sale of any "new drug" unless an approved application is in effect for such drug under federal law.

86. Cenexa's purported retatrutide products are "new drugs" within the meaning of Connecticut law. Retatrutide has not been approved by FDA, is not yet generally recognized as safe and effective, and has not been used to a material extent or for a material time.

87. Cenexa has violated Conn. Gen. Stat. § 21a-110(a)–(b) by distributing, selling, and offering for sale unapproved retatrutide products to consumers in Connecticut and throughout the United States.

88. Cenexa's sale of unapproved new drugs in violation of Conn. Gen. Stat. § 21a-110(a)–(b) constitutes an unfair or deceptive act or practice in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b(a).

89. Lilly has been injured by Cenexa's unlawful conduct, including through lost sales, damage to goodwill, harm to Lilly's competitive position, and diversion of consumers to unapproved and potentially unsafe products.

90. Lilly has standing to bring this action and is entitled to all available remedies under Conn. Gen. Stat. § 42-110g, including injunctive relief, damages, and reasonable attorneys' fees and costs.

**<u>FOURTH CAUSE OF ACTION</u>**
**Unfair Competition**
**in Violation of North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. §§ 75-1.1 *et seq.***

91. Lilly incorporates by reference the allegations above as if fully set forth herein.

92. The North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, declares unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

93. N.C. Gen. Stat. § 106-135 prohibits the sale, delivery, or offering for sale of any "new drug" unless an approved application is in effect for such drug under federal law.

94. Cenexa's purported retatrutide products are "new drugs" within the meaning of North Carolina law. Retatrutide has not been approved by FDA, is not yet generally recognized as safe and effective, and has not been used to a material extent or for a material time.

95. Cenexa has violated N.C. Gen. Stat. § 106-135 by distributing, selling, and offering for sale unapproved retatrutide products to consumers in North Carolina and throughout the United States.

96. Cenexa's sale of unapproved new drugs in violation of N.C. Gen. Stat. § 106-135 constitutes an unfair or deceptive act or practice in violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1.

97. Lilly has been injured by Cenexa's unlawful conduct, including through lost sales, damage to goodwill, harm to Lilly's competitive position, and diversion of consumers to unapproved and potentially unsafe products.

98. Lilly has standing to bring this action and is entitled to all available remedies under N.C. Gen. Stat. § 75-16, including injunctive relief, damages, and reasonable attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**
**Unfair Competition**
**in Violation of the South Carolina Unfair Trade Practices Act**
**S.C. Code §§ 39-5-20 *et seq*.**

99. Lilly incorporates by reference the allegations above as if fully set forth herein.

100. The South Carolina Unfair Trade Practices Act, S.C. Code § 39-5-20, declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

101. S.C. Code § 39-23-70 prohibits the sale, delivery, or offering for sale of any "new drug" unless an approved application is in effect for such drug under federal law.

102. Cenexa's purported retatrutide products are "new drugs" within the meaning of South Carolina law. Retatrutide has not been approved by FDA, is not yet generally recognized as safe and effective, and has not been used to a material extent or for a material time.

103. Cenexa has violated S.C. Code § 39-23-70 by distributing, selling, and offering for sale unapproved retatrutide products to consumers in South Carolina and throughout the United States.

104. Cenexa's sale of unapproved new drugs in violation of S.C. Code § 39-23-70 constitutes an unfair or deceptive act or practice in violation of the South Carolina Unfair Trade Practices Act, S.C. Code §§ 39-5-20 *et seq.*

105. Lilly has been injured by Cenexa's unlawful conduct, including through lost sales, damage to goodwill, harm to Lilly's competitive position, and diversion of consumers to unapproved and potentially unsafe products.

106. Lilly has standing to bring this action and is entitled to all available remedies under S.C. Code § 39-5-140, including injunctive relief, actual damages, treble damages, and reasonable attorneys' fees and costs.

## SIXTH CAUSE OF ACTION
**Unfair Competition**
**in Violation of the Tennessee Consumer Protection Act**
**Tenn. Code §§ 47-18-104 *et seq.***

107. Lilly incorporates by reference the allegations above as if fully set forth herein.

108. The Tennessee Consumer Protection Act, Tenn. Code § 47-18-104, prohibits unfair or deceptive acts or practices affecting the conduct of any trade or commerce.

109. Tenn. Code § 53-1-110 prohibits the sale, delivery, or offering for sale of any "new drug" unless an approved application is in effect for such drug under federal law.

110. Cenexa's purported retatrutide products are "new drugs" within the meaning of Tennessee law. Retatrutide has not been approved by FDA, is not yet generally recognized as safe and effective, and has not been used to a material extent or for a material time.

111. Cenexa has violated Tenn. Code § 53-1-110 by distributing, selling, and offering for sale unapproved retatrutide products to consumers in Tennessee and throughout the United States.

112. Cenexa's sale of unapproved new drugs in violation of Tenn. Code § 53-1-110 constitutes an unfair or deceptive act or practice in violation of the Tennessee Consumer Protection Act, Tenn. Code § 47-18-104.

113. Lilly has been injured by Cenexa's unlawful conduct, including through lost sales, damage to goodwill, harm to Lilly's competitive position, and diversion of consumers to unapproved and potentially unsafe products.

114. Lilly has standing to bring this action and is entitled to all available remedies under Tenn. Code § 47-18-109, including injunctive relief, damages, and reasonable attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION
## Unfair Competition in Violation of Texas Common Law

115. Lilly incorporates by reference the allegations above as if fully set forth herein.

116. Under Texas common law, unfair competition encompasses any dishonest or fraudulent rivalry in trade and commerce, including the sale of products in violation of applicable law to gain an unfair competitive advantage.

117. Tex. Health & Safety Code § 431.114(a) prohibits the sale, delivery, or offering for sale of any "new drug" unless an approved application is in effect for such drug under federal law.

118. Cenexa's purported retatrutide products are "new drugs" within the meaning of Texas law. Retatrutide has not been approved by FDA, is not yet generally recognized as safe and effective, and has not been used to a material extent or for a material time.

119. Cenexa has violated Tex. Health & Safety Code § 431.114(a) by distributing, selling, and offering for sale unapproved retatrutide products to consumers in Texas and throughout the United States.

120. Cenexa's sale of unapproved new drugs in violation of Tex. Health & Safety Code § 431.114(a) constitutes common law unfair competition under Texas law.

121. Lilly has been injured by Cenexa's unlawful conduct, including through lost sales, damage to goodwill, harm to Lilly's competitive position, and diversion of consumers to unapproved and potentially unsafe products.

122. Cenexa's conduct was willful and malicious, entitling Lilly to exemplary damages under Texas law.

123. Lilly has standing to bring this action and is entitled to all available remedies, including injunctive relief, damages, and a declaratory judgment under Tex. Civ. Prac. & Rem. Code § 37.009, as well as reasonable attorneys' fees and costs.

## EIGHTH CAUSE OF ACTION
## Unfair Competition
## in Violation of the Washington Consumer Protection Act
## R.C.W. §§ 19.86.010 *et seq*.

124. Lilly incorporates by reference the allegations above as if fully set forth herein.

125. The Washington Consumer Protection Act, R.C.W. § 19.86.020, declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

126. R.C.W. § 69.04.570 prohibits the sale, delivery, or offering for sale of any "new drug" unless an approved application is in effect for such drug under federal law.

127. Cenexa's purported retatrutide products are "new drugs" within the meaning of Washington law. Retatrutide has not been approved by FDA, is not yet generally recognized as safe and effective, and has not been used to a material extent or for a material time.

128. Cenexa has violated R.C.W. § 69.04.570 by distributing, selling, and offering for sale unapproved retatrutide products to consumers in Washington and throughout the United States.

129. Cenexa's sale of unapproved new drugs in violation of R.C.W. § 69.04.570 constitutes an unfair or deceptive act or practice in violation of the Washington Consumer Protection Act, R.C.W. § 19.86.020.

130. Lilly has been injured by Cenexa's unlawful conduct, including through lost sales, damage to goodwill, harm to Lilly's competitive position, and diversion of consumers to unapproved and potentially unsafe products.

131. Lilly has standing to bring this action and is entitled to all available remedies under R.C.W. § 19.86.090, including injunctive relief, damages, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lilly prays that this Court enter judgment in Lilly's favor on Lilly's claims and award Lilly relief including:

1. An Order declaring that Cenexa:

   i. Engaged in unfair competition in violation of the Alaska Unfair Trade Practices and Consumer Protection Act by its unlawful distribution and sale of unapproved new drugs in violation of the Alaska Food, Drug, and Cosmetic Act;

   ii. Engaged in unfair trade practices in violation of the Colorado Consumer Protection Act by unlawful distribution and sale of unapproved new drugs in violation of Colo. Rev. Stat. § 12-280-131(1);

   iii. Engaged in unfair trade practices in violation of the Connecticut Unfair Trade Practices Act by unlawful distribution and sale of unapproved new drugs in violation of Conn. Gen. Stat. § 21a-110(a)-(b);

   iv. Engaged in unfair trade practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act by its unlawful distribution and sale of unapproved new drugs in violation of the North Carolina Food, Drug, and Cosmetic Act, N.C. Gen. Stat. § 106-135;

   v. Engaged in unfair trade practices in violation of the South Carolina Unfair Trade Practices Act by its unlawful distribution and sale of unapproved new drugs in violation of S.C. Code § 39-23-70;

vi. Engaged in unfair trade practices in violation of the Tennessee Consumer Protection Act by its unlawful distribution and sale of unapproved new drugs in violation of Tenn. Code § 53-1-110;

vii. Engaged in unfair trade practices in violation of the Washington Consumer Protection Act by unlawful distribution and sale of unapproved new drugs in violation of R.C.W. § 69.04.570; and

viii. Engaged in unfair competition under Texas common law by unlawful distribution and sale of unapproved new drugs in violation of Tex. Health & Safety Code § 431.114(a).

2. A permanent injunction enjoining Cenexa and its officers, agents, servants, employees, and all persons acting in concert with them from marketing, advertising, distributing, dispensing, or selling any product containing or purporting to contain retatrutide.

3. An Order directing Cenexa to file with this Court and serve on Lilly's attorneys, thirty (30) days after the date of entry of any injunction, a report in writing and under oath setting forth in detail the manner and form in which it has complied with the Court's injunction.

4. An Order requiring Cenexa to account for and pay to Lilly any and all monetary damages, including disgorgement of profits, arising from the foregoing unlawful acts.

5. An Order for pre-judgment and post-judgment interest on all damages.

6. An Order requiring Cenexa to pay Lilly's costs and attorneys' fees in this action pursuant to the Alaska Unfair Trade Practices and Consumer Protection Act, the Colorado Consumer Protection Act, the Connecticut Unfair Trade Practices Act, the North Carolina Unfair and Deceptive Trade Practices Act, the South Carolina Unfair Trade Practices Act, the Tennessee Consumer Protection Act, Tex. Civ. Prac. & Rem. Code § 37.009, the Washington Consumer Protection Act, and any other applicable provision of law.

7. Other relief as the Court may deem appropriate.

**JURY DEMAND**

Plaintiff Eli Lilly and Company hereby demands a trial by jury on all issues so triable.

Dated: November 2, 2026

Respectfully submitted,

/s/ *James John Lomeo*
James John Lomeo (*Attorney-in-charge*)
Texas Bar No. 24118993
KIRKLAND & ELLIS LLP
401 West 4th Street
Austin, TX 78701
Telephone: (512) 355-4316
Facsimile: (512) 678-9101
james.lomeo@kirkland.com

Diana M. Watral (*pro hac vice forthcoming*)
James R.P. Hileman (*pro hac vice forthcoming*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
diana.watral@kirkland.com
jhileman@kirkland.com

David I. Horowitz (*pro hac vice forthcoming*)
KIRKLAND & ELLIS LLP
2049 Century Park East, 38th Floor
Los Angeles, CA 90067
Telephone: (213) 680-8374
Facsimile: (310) 552-5900
dhorowitz@kirkland.com

Chase Chesser (*pro hac vice forthcoming*)
KIRKLAND & ELLIS LLP
150 3rd Avenue South, Suite 1220
Nashville, TN 37201
Telephone: (629) 222-0131
Facsimile: (629) 222-0101
chase.chesser@kirkland.com

*Counsel for Plaintiff Eli Lilly and Company*